JOHN J. DiGLORIA *vs.* CHIEF OF POLICE OF METHUEN.

Essex.    September 14, 1979. — October 25, 1979.

Present: BROWN, GREANEY, & KASS, JJ.

*Police. Municipal Corporations*, Estoppel. *Estoppel. Words*, "In the performance of duty," "Without fault of his own."

The concept of fault as used in G. L. c. 41, § 111F, means serious and wilful misconduct on the part of a police officer. [512-514]

Where there was evidence that a police officer working as an undercover narcotics agent became voluntarily involved with a variety of drugs, including heroin, in violation of the regulations of his unit, the officer's resulting incapacity for duty was not "without fault of his own" within the meaning of G. L. c. 41, § 111F. [514-515]

The fact that a town's police chief maintained a police officer on the payroll in the status of "injured" under the provisions of G. L. c. 41, § 111F, over a period in excess of two years did not give rise to an estoppel prohibiting termination of such status by the town. [515-516]

CIVIL ACTION commenced in the Superior Court on February 4, 1977.

The case was heard by *DeGuglielmo*, J., a Municipal Court judge sitting under statutory authority.

*Peter J. McQuillan,* Town Solicitor, for the defendant, submitted a brief.

*Charles M. Crowley, Jr.,* for the plaintiff.

GREANEY, J. The plaintiff, a policeman, brought a complaint in substance seeking declaratory and other relief to establish his claim of right to be granted leave without loss of pay under G. L. c. 41, § 111F, as appearing in St. 1964, c. 149.[1] This statute, in so far as it applies to this case, grants leave without loss of pay to a police officer "incapacitated for duty because of injury sustained in the performance of his duty without fault of his own." The incapacity complained of stemmed from the plaintiff's voluntary use of narcotic drugs while working as an undercover narcotics agent. The case was presented to a Municipal Court judge sitting in the Superior Court under statutory authority on a "statement of agreed facts"[2] and exhibits. On that record a judgment entered declaring that the plaintiff suffered an incapacity as a result of his police duties and that "such disability incapacitated him involuntarily and without fault on his part" from performance of his police duties. The judgment ordered the chief to take appropriate action to pay the plaintiff's

[1] The complaint was brought only against the chief of police who, it was agreed, was responsible to the treasurer for periodically certifying the members of the police department entitled to receive compensation. The action adequately frames a dispute between the plaintiff and the chief. Neither party has raised any question as to the absence of the treasurer or the town as a party, and as a result, we do not raise on our own the need for the presence of any additional parties.

[2] The use of this caption as to the materials presented to the judge is a misnomer. The statement consists of some agreed facts and the reproduction of other pieces of evidence, principally a job description for police officers assigned to the undercover narcotics unit and a police report detailing the defendant's investigation of the plaintiff's conduct. To it is attached a series of exhibits consisting of medical reports, certain hospital records, an affidavit of one James Terry, a drug informant, and other materials. More properly, the case was presented in part on a statement of agreed facts and in part upon a statement of agreed evidence. This does not, however, alter our standard of review hereafter described.

salary and continuing medical bills. Since the case was presented on agreed facts and stipulated exhibits, and issues of credibility were not involved, we are not bound by the judge's conclusions, and we are free to draw our own inferences, decide the questions of law involved, and determine the appropriate judgment. *Mahony* v. *Assessors of Watertown,* 362 Mass. 210, 211 (1972). *Boston Teachers Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 468, n.9 (1976). *Foxborough* v. *Bay State Harness Horse Racing & Breeding Assn., Inc.,* 5 Mass. App. Ct. 613, 615 (1977). We reverse.

The pertinent facts are these. The plaintiff, now age thirty-one, became a permanent police officer in Methuen in 1971. In early 1975 he volunteered for and was assigned to work with the Metropolitan Enforcement Group (M.E.G.) in undercover work regarding illegal drugs. A major goal of the group was to penetrate drug activities by cultivating contacts with informants and drug users and sellers in order to identify and prosecute persons for violations of State drug laws. DiGloria was sent to a two-week drug identification course conducted by the Federal government, where he received training in all phases of the drug culture. Later, he was assigned to work with an experienced M.E.G. undercover agent, William Thompson, from whom he received additional on-the-job training. He and Thompson frequented clubs and bars in order to become acquainted with drug users and to be led to drug sellers. They spent money, in the line of duty, and for which they were reimbursed, on alcoholic beverages for themselves, informants, and casual acquaintances. DiGloria and Thompson also developed and used techniques to create the impression, in order to gain the confidence of certain people, that they were using illegal drugs.

On March 31, 1975, DiGloria and Thompson were on duty in a bar when DiGloria "accidentally ingested 'choco' mescaline" which caused him to hallucinate and suffer other adverse reactions. This incident went un-

reported to his superiors. Apparently no permanent ill effects were suffered. An informant, one James Terry, a former heroin addict assigned to DiGloria and Thompson, informed the chief that between April and August, 1975, DiGloria smoked marihuana with Terry on several occasions without Thompson's knowledge. During that period, DiGloria told Terry that he (DiGloria) was under the influence of certain drugs procured by him as the result of certain arrests. There was also evidence that Terry and DiGloria engaged in a stolen check cashing scheme (the checks were apparently stolen by Terry with DiGloria's knowledge) which was used to supply money to purchase heroin and other drugs for DiGloria in Worcester. Worcester was outside the jurisdiction of DiGloria's M.E.G. unit, and the trips to Worcester were unknown to his superiors.

By the middle of July, 1975, and for some time prior to that, DiGloria had become confused, depressed and anxious. Succumbing to the urgings of a female informant that an injection of heroin would make him feel better, he had gone to the informant's apartment and requested a heroin injection. In this fashion, DiGloria became a heroin addict. Upon discovery of the foregoing, on August 22, 1975, he was removed from the unit and carried on the payroll of the town as injured in the line of duty. It was expressly agreed that all the described activities involving drug use occurred without knowledge of his superiors and contravened his training. His drug use, in particular the heroin injection, was in express violation of both the rules and regulations of the M.E.G. and those of the Methuen police department. DiGloria has not been discharged from his position as a patrolman. The chief terminated his status as injured in the line of duty under G. L. c. 41, § 111F, on September 14, 1977, thereby precipitating this lawsuit.[3]

---

[3] DiGloria has applied for accidental disability retirement under the provisions of G. L. c. 32, § 7. The Methuen contributory retirement

The judge below also had before him considerable medical evidence in the form of exhibits attached to the statement of agreed facts. This evidence fell into the following categories: (1) medical records and doctors' reports tracing DiGloria's course of treatment for his drug addiction from the date he was removed from active police assignment, (2) medical opinions about his fitness and capacity for further police work, and (3) medical opinions concerning the existence of a link between his job and his addiction. The medical evidence establishes that he suffers from a psychosis due to multiple drug intoxication and that excellent progress is being made in curing his drug dependency. There is also an indication in the records that he has a medical condition due to a respiratory allergy which caused him to have a low tolerance for drugs. All the examining physicians concur that during the material periods in issue he was, and remains, unfit to perform the duties of a police officer. On the question of the relationship between his narcotics assignment and his addiction, the medical evidence differs. Doctor Nicholas D. Rizzo, his treating psychiatrist, concluded that DiGloria's addiction developed from a hazard peculiar to his employment. Doctor David D. Swenson, a psychiatrist retained by the defendant to evaluate DiGloria's condition, concluded that the officer did not become addicted

board has denied his application for such retirement, concluding that his disability was not incurred in the performance of his duties and resulted from serious and wilful misconduct on his part. This decision is presently on appeal to the State Contributory Retirement Appeal Board under the provisions of G. L. c. 32, § 16(4). Neither party has raised the possibility of vacating the judgment and staying proceedings in this case until the appeal of the retirement disability claim is disposed of. This would not be an appropriate course of action in this case because of the differing issues in the two proceedings, the inability of the agency to grant the relief requested, the need of a judicial determination of the appropriate definition of fault, and the fact that such a deferral would probably compound, rather than simplify, the ultimate course of the litigation. *Gallagher* v. *Metropolitan Dist. Commn.*, 371 Mass. 691, 699 (1977). *Murphy* v. *Administrator of the Div. of Personnel Admn.*, 377 Mass. 217, 221-222 (1979).

to heroin or other drugs as a direct result of his narcotics work and that any addiction "would have been on a voluntary basis."

This appeal raises three issues for our consideration: (1) whether DiGloria's injury was sustained in the course of his duty as an undercover agent for M.E.G.; (2) whether DiGloria was injured without fault of his own; and (3) whether the doctrine of equitable estoppel should be applied on the facts of this case.

1. *"Injury sustained in the performance of duty."* DiGloria's incapacity for present duty is admitted. The defendant also appears to concede that the incapacity stemmed from an injury sustained in the performance of the plaintiff's duty. On this aspect of G. L. c. 41, § 111F, the standard for determining whether the injury occurred in the performance of the police officer's duty was defined in *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 663 (1975), as "comparable to the words 'arising out of and in the course of his employment' contained in § 26 of the Workmen's Compensation Act, G. L. c. 152," as amended through St. 1973, c. 855, § 1. The *Wormstead* decision adopted the settled construction of the language in c. 152, § 26, just quoted as bearing on the police disability statute and held that several factors were particularly pertinent to a police officer's claim, namely whether "the [officer's] injury occurred during a period (1) for which he was being paid, (2) when he was on call, and (3) while he was engaged in activities consistent with and helpful to the accomplishment of police functions." *Id.* at 664. The facts in this case bearing on the heroin episode are cryptic with regard to whether that incident fell within the factors enumerated above, especially the third factor. There is material in the record to indicate that DiGloria's prior contacts with drugs fell beyond the scope of his undercover assignment. On the whole, there is not enough for us to make a clear cut and informed decision on the issue. Because of this, and in view of the defendant's concession that the disability occurred in the performance of the

plaintiff's duties, we pass this question and turn to the dispositive issue of whether the injury occurred as a result of his fault.

2. *"Without fault of his own."* No case has been brought to our attention dealing directly with the standards to be applied in construing the fault language in G. L. c. 41, § 111F.[4] The *Wormstead* decision has told us, however, to look to cases interpreting analogous provisions of the Workmen's Compensation Act, G. L. c. 152, in deciding issues arising under G. L. c. 41, § 111F. *Wormstead* v. *Town Manager of Saugus, supra* at 663-664 n.5. In a general sense this reference to workmen's compensation cases is particularly apt because c. 41, § 111F, is designed to do for police officers what c. 152 does for industrial workers who incur job related injuries.

The most closely analogous section of c. 152 to our problem is § 27 as appearing in St. 1935, c. 331, which, since 1911, has provided that an employee injured by reason of "his serious and wilful misconduct" shall be denied compensation. In our opinion, the concept of fault as used in G. L. c. 41, § 111F, should be construed, despite the difference in words between the two statutes, to mean serious and wilful misconduct on the part of the police officer. We reach this conclusion in the absence of any legislative history to the contrary and in reliance on easily perceptible policy grounds concerning the hazards of a police officer's job which militate against imposition of a lower standard.[5] The cases expand on what constitutes

---

[4] There is language in one case, *Pettinella* v. *Worcester,* 355 Mass. 412, 414 (1969), which can be taken to imply that the fault language in the statute might mean conduct measured at least by ordinary negligence standards. We do not take this language as controlling in view of the clear directions given in the *Wormstead* case to relate the interpretation of provisions of c. 41, § 111F, to comparable provisions of G. L. c. 152, as hereafter explained.

[5] For example, no one would seriously contend that a police officer who is injured due to his own negligence in a high speed chase of a dangerous felon, or that an officer who negligently fails to wear a bullet proof vest when chasing an armed bank robber and is shot, should be denied recovery because of such negligence.

such misconduct by an employee. One of the earliest, *Silver's Case,* 260 Mass. 222, 224 (1927), defines this type of misconduct as "much more than mere negligence, or even than gross or culpable negligence. It involves conduct of a quasi criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or with a wanton and reckless disregard of its probable consequences."[6] Disregard of a regulation by itself is not enough. *Id.* See also *D'Angeli's Case,* 369 Mass. 812, 818 (1976) (exercise of poor judgment not enough). "The word serious refers to the conduct itself and not to its consequences. Wilful implies intent or such recklessness as is the equivalent of intent." *Dillon's Case,* 324 Mass. 102, 110 (1949). Accord, *Mercier's Case,* 350 Mass. 299, 301 (1966). Several cases beginning with *Scaia's Case,* 320 Mass. 432, 434 (1946), have also directed attention to the definition of "reckless disregard of safety" appearing in the Restatement of Torts as a standard.[7] See *Dillon's Case, supra* at 110 ("easily perceptible danger of substantial bodily harm or death and a great

[6] The court in this case wās construing the provisions of G. L. c. 152, § 28, which provides double compensation for an employee whose employer's serious and wilful misconduct causes injury to the employee. The phrase is the same in both sections, and the cases arising under § 28 have adopted the same standards as those under § 27. See e.g., *Randolph's Case,* 247 Mass. 245, 247-248 (1924); *Thayer's Case,* 345 Mass. 36, 40 (1962); *Gleason's Case,* 345 Mass. 759, 760 (1962); *O'Leary's Case,* 367 Mass. 108, 111-113 (1975); *Paccia's Case,* 4 Mass. App. Ct. 830 (1976).

[7] The pertinent Restatement (Second) of Torts (1965) black letter provisions are these:

"§ 500. Reckless Disregard of Safety Defined. The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

chance that such harm will result"); *Garnhum's Case*, 348 Mass. 87, 90 (1964); *Tripp's Case*, 355 Mass. 515, 518 (1969); *O'Leary's Case*, 367 Mass. 108, 115-116 (1975) (reaffirming and clarifying reliance on the Restatement).

We agree with the defendant that DiGloria's actions fall within the category of serious and wilful misconduct. In preparation for his undercover assignment, he received considerable training in drug identification. As a result of that training and his police experience, the hazards of the use and abuse of hard drugs should have been obvious to him. Similarly, he was, or should have been, aware of his low physical tolerance for drugs. He had also been schooled in techniques designed to create the impression in people within the milieu of his operations that he was using illegal drugs without their actual use. Many of his off-duty activities went beyond the scope of his assignment and consisted of unauthorized extracurricular contacts with informants. There is persuasive evidence in the record that DiGloria had become voluntarily involved with the use of a variety of drugs other than heroin considerably prior to the episode involving that drug and that he had even participated in a criminal check cashing scheme in Worcester to purchase drugs. There is no indication that his accidental ingestion of mescaline on March 31, 1975, led or contributed to his use of other drugs or his ultimate addiction to heroin. The heroin injection which caused his disability was admittedly voluntary. All of his actions were in violation of the rules and regulations of his unit and those of the department, a factor which is not conclusive but which is entitled to weight.

The medical evidence presented does not vary our conclusion. Most of that evidence does not address the question of a causal link between DiGloria's job and his disability. Of the two reports that do respond to that issue, the findings of Doctor Swenson indicate that DiGloria did not become addicted to heroin or other drugs as a direct result of his undercover work but rather that he incurred

his addiction by reason of the voluntary use of drugs.[8] Doctor Rizzo's conclusion that DiGloria was without fault is a legal conclusion rather than a medical opinion.

We conclude that the plaintiff engaged in an intentional course of conduct which caused his disability or, at the very least, that he acted recklessly by voluntarily exposing himself to circumstances "which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct." Restatement (Second) of Torts § 500, Comment c (1964). We cannot agree that his actions were unintentional or within the realm of conduct consistent with negligence or gross negligence. Accordingly, the judge's conclusions to the contrary are in error.

3. *Estoppel.* The plaintiff also argues that the conduct of the defendant in maintaining DiGloria on the payroll in the status of injured under the provisions of G. L. c. 41, § 111F, over a period in excess of two years constitutes an equitable estoppel binding on the town. The argument in this regard is that DiGloria would have sought an alternative and presumably less expensive, means of psychiatric treatment had he known that his status was being questioned, and that he might have proceeded with a different form of claim if the defendant had initially indicated that he was not entitled to "injured in the line of duty" pay and benefits. The record satisfies us that the plaintiff was designated in this status under the statute until September 14, 1977, to permit an extensive and thorough evaluation of his claim, and in particular its medical aspects. It also appears that the parties were awaiting the decision of the Methuen contributory retirement board on the accidental disability retirement claim

---

[8] The evidence indicates that DiGloria voluntarily ingested a variety of drugs for a period of several months prior to the heroin incident. We conclude that this voluntary ingestion rather than stressful incidents on the job led to the confused, depressed state in which he found himself and for which he requested the first heroin injection. Contrast *Albanese's Case*, 378 Mass. 14 (1979).

filed under c. 32, § 7. The decision was not made until April 14, 1977. Moreover, the general tenor of authority does not apply the doctrine of estoppel against the enforcement of a statute, see, e.g., *Sorenti* v. *Board of Appeals of Wellesley*, 345 Mass. 348, 352 (1963); *New City Hotel Co.* v. *Alcoholic Beverages Control Commn.*, 347 Mass. 539, 542 (1964); *Doris* v. *Police Commr. of Boston*, 374 Mass. 443, 449-450 (1978), or to the exercise of a governmental function by a municipality, see generally 6 McQuillin, Municipal Corporations § 20.13, at 34, § 24.41, at 561 (3d ed. 1969), or to facts where a plaintiff received some benefits by virtue of the claimed erroneous action of the municipality. See, e.g., *Weiner* v. *Boston*, 342 Mass. 67, 70 (1961); *Welch* v. *Contributory Retirement Appeal Bd.*, 343 Mass. 502, 512 (1962).

4. *Disposition.* The judgment is reversed. A new judgment is to be entered declaring that the plaintiff is not entitled to leave without loss of pay under the provisions of G. L. c. 41, § 111F.

*So ordered.*