Susan Becker *vs.* Town of Newbury.

No. 07-P-1068.

Essex. April 7, 2008. - October 9, 2008.

Present: McHugh, Katzmann, & Grainger, JJ.

*Public Employment,* Police, Paid leave, Accidental disability retirement. *Police,* Injury on duty, Incapacity. *Municipal Corporations,* Police, Officers and employees.

In a civil action concerning the disability benefits to which a former reserve police officer injured in the line of duty was entitled, the judge properly granted summary judgment in favor of the defendant town employer, where the town had properly calculated the plaintiff's disability benefits under G. L. c. 41, § 111F (governing paid leave for incapacitated employees), based on the plaintiff's average weekly wage during the year preceding her incapacitating injury, rather than an amount equal to her anticipated earnings during the week she was injured [808-812], and where the town properly declined to pay the plaintiff the benefits provided by G. L. c. 32, § 85H, to reserve police officers injured in the line of duty to the point where they no longer could perform the duties of their regular occupation, given that the plaintiff's operation of a private investigation business that never produced net income qualified neither as a "regular occupation" nor as a "substantial source of income" for purposes of that statute, which was designed to cushion the blow of a loss of current income of reserve police officers, not to provide a hedge against their speculative future losses [812-814].

CIVIL ACTION commenced in the Superior Court Department on July 22, 2002.

The case was heard by *Diane M. Kottmyer*, J., on motions for summary judgment.

*Robert C. Tommasino* for the plaintiff.

*Ginny Sinkel Kremer*, Town Counsel, for the defendant.

McHugh, J. Susan Becker, the plaintiff, worked as a reserve police officer in the town of Newbury (town) from 1995 until late January, 2001, when she struck her head on a cabinet while investigating a breaking and entering. She suffered a concussion

and a cervical sprain and never returned to work. Instead, she began receiving disability payments from the town.

In July, 2002, Becker filed suit against the town, claiming that it had inaccurately calculated the disability benefits she was entitled to receive under G. L. c. 41, § 111F, which governs paid leave for incapacitated employees.[1] She also claimed that the town had improperly refused to pay her the benefit to which she was entitled under G. L. c. 32, § 85H, which provides benefits to reserve police officers who are injured in the line of duty to the point where they no longer can perform the duties of their regular occupation.

On the parties' cross motions for summary judgment, a judge of the Superior Court, in a thoughtful memorandum of decision, agreed that the town had properly calculated Becker's benefits under § 111F to be $144.36 per week based on the average of her earnings during the twelve months preceding her injury, and had properly declined to pay her the benefits provided by § 85H. Becker timely appealed. We affirm.

Becker's first argument on appeal is that although her average weekly earnings over the twelve months before her injury were in fact $144.36, she was entitled to benefits of $398.89, the amount she anticipated receiving during the week she was injured. She bases that claim on the language of § 111F, as appearing in St. 1964, c. 149, which provides that officers who are incapable of working because of duty-related injuries "shall be granted leave without loss of pay for the period of such incapacity." In Becker's view, the phrase "leave without loss of pay" means leave with the weekly wage the employee was earning at the moment of the injury, regardless of what she had earned in the past or could anticipate earning in the future.

The problem, of course, centers on construction of the phrase "leave without loss of pay," because the Legislature has not specified how to determine the "pay" the injured employee should not lose on account of the injury. Theoretically, that

---

[1]Several years after her accident, Becker applied to the Public Employee Retirement Administration Commission (PERAC) for disability retirement benefits. Her application was approved November 22, 2005. Her claim under § 111F pertains to the period between the date of her injury and November 22, 2005.

"pay" could be the employee's earnings during the hour before the injury, the average hourly wages over the course of the employee's service with the employer or something in between.

The origin of the statute provides a context for determining the "pay" that § 111F is designed to safeguard. In *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 663 n.5 (1975), the Supreme Judicial Court observed that the Commonwealth's original workers' compensation statute, enacted in 1911, provided no coverage for government employees. Thereafter, a series of amendments to the statute afforded most government employees benefits analogous to those received by their counterparts in the private sector. The statute never was extended, however, to police officers or fire fighters. In the court's view, § 111F was designed to fill that gap. *Ibid.*

Given that gap-filling foundation, the court in *Wormstead* concluded that § 111F's benefit-triggering phrase "injury sustained in the performance of his duty," as appearing in St. 1964, c. 149, was comparable to, and should be construed in the same manner as, the benefit-triggering phrase "personal injury arising out of and in the course of his employment" found in the Workers' Compensation Act, see G. L. c. 152, § 26, as appearing in St. 1943, § 8. *Id.* at 663. Thereafter, when faced with a question regarding the proper construction of § 111F, both this court and the Supreme Judicial Court consistently have referred to construction of analogous provisions of the workers' compensation statute. See, e.g., *Corbett* v. *Related Cos. N.E., Inc.*, 424 Mass. 714, 721 (1997); *DiGloria* v. *Chief of Police of Methuen*, 8 Mass. App. Ct. 506, 512 (1979); *Blair* v. *Selectmen of Brookline*, 24 Mass. App. Ct. 261, 263-264 (1987).[2]

Against that backdrop, we think that "pay" under § 111F ordinarily should be determined by the average weekly wage the police officer or the fire fighter earned during the year preceding her incapacitating injury.[3] That wage is the baseline

---

[2]The preference for comparable construction of analogous provisions in the two statutes does not mean that conflicting differences in language may be ignored or that provisions of the workers' compensation statute may be engrafted on § 111F even if the Legislature did not place them there. See *Eyssi* v. *Lawrence*, 416 Mass. 194, 199-201 (1993); *Corbett* v. *Related Cos. N.E., Inc.*, 424 Mass. at 720-722; *O'Donovan* v. *Somerville*, 41 Mass. App. Ct. 917, 918-919 (1996).

[3]There may be particular circumstances in which average weekly wages

for calculating benefits under the workers' compensation statute, see G. L. c. 152, §§ 1(1), 34, 34A, 35, and, given the origin of § 111F, is an appropriate reference for use when calculating the "pay" of injured fire fighters and police officers.[4]

Equally important, calculating an injured person's "pay" on the basis of his or her average weekly earnings over the twelve months preceding the injury protects both the employer and the employee against the vagaries of wage fluctuations produced largely by chance. This case, and the arguments Becker makes, illustrate the effect such fluctuations may have.

The four full years preceding Becker's injury witnessed a steady decline in her annual earnings as a reserve police officer. In 1997, she earned $20,242.10; in 1998, she earned $18,520.09; in 1999, she earned 10,735.34; and in 2000, the year before her injury, she earned $7,330.83. Her earnings over that period were, in sum, steadily declining.[5] For reasons the record does not reflect,

during the preceding year would be either insufficient or excessive, in which case a different and more specifically tailored approach to calculation of "pay" would be appropriate. A promotion, changing the compensation rate; a shift from part-time to full-time employment; or a change from an hourly rate of pay to an annual salary are examples of circumstances that might make a purely historical approach to determining the employee's "pay" inappropriate. See, e.g., *Gunderson's Case*, 423 Mass. 642, 644-645 (1996) (under workers' compensation statute, retroactive pay raise may be taken into account in determining "average weekly wages"); *Carnute's Case*, 17 Workers' Comp. Rptr. 214, 218 (2003) ("The courts and the reviewing board have endorsed alternative methods of calculating average weekly wages where the statute is not applicable in a particular case or where evidence has not been introduced which would allow the calculation of average weekly wages in accordance with the statute"). Particular circumstances of that type are not present here.

[4]Becker maintains that, "[g]iven that Chapter 41 is designed to provide greater protection for those in public service who face dangerous conditions on the job, it would be incongruous for the Court to adopt the theory that the Legislature's intent was the same as that which supports the Workers' Compensation Act. Chapter 41 was created to give police officers and firefighters broader and more expansive benefits than those available to non-police officers and non-fire fighters under the Workers' Compensation Act." Using the annualized wage model for determining the "pay" that § 111F protects does not conflict with those sentiments. Under § 111F, the injured police officer or fire fighter is entitled to full pay while injured. Under the cited sections of the Workers' Compensation Act, employees receive only a portion of what they were earning at the time they were injured.

[5]Becker claims that she had been taking care of her ill mother during the during the period between March and November, 2000, and that the time she

her earnings for the first two weeks of January, 2001, spiked to a weekly average of $392.76, which, if extended for the entire year would have produced an annual wage of $20,423.52, the greatest amount she would have earned during the five years the record covers.

Notwithstanding the steady annual decline and the brief spike, Becker, as noted, claims that she is entitled to weekly compensation under § 111F in the amount of $398.89, or $20,742.28 annually, because she claims she was on track to earn that amount during the third week of January, 2001, when she was injured.[6] Acceptance of Becker's approach, however, would mean that the compensation provided by § 111F would depend almost entirely on chance.

In this case, Becker's approach would saddle taxpayers with an obligation to pay § 111F compensation at a rate higher than the record shows Becker ever had earned simply because of the fortuity that she was injured while earning at a momentary high level. We say "momentary" because despite Becker's claims that resolution of several personal issues meant that she was available for more work than she had been in the past, there is no evidence in the record that the town was prepared to have her work the maximum number of hours she claimed to have available.

In a different case, Becker's approach could produce a result highly disadvantageous to the injured employee. Although Becker was injured at a high point in her earnings, she just as easily could have been injured when her anticipated weekly wage was far lower than her historical earnings. Becker's approach would mean that, in those circumstances, she would have been entitled to compensation at a rate far lower than the rate the town in fact provided.

We think that the Legislature could not have intended to create a scheme in which taxpayers, police officers, and fire fighters all were dependent on the vagaries of chance to determine the compensation due for work-related injuries. Absent other circumstances, basing compensation on historical annual aver-

was required to devote to her mother's care accounts for her low earnings in 2000. She does not cite care for her mother as a factor in the sharp decline in earnings over the years 1997 through 1999.

[6]For that week, she actually was paid $291.12.

ages is the best method for preserving the "pay" with which the Legislature was manifestly concerned when it enacted § 111F. Indeed, we think that, as Becker herself states, "[S]he should be paid benefits that most accurately reflect her projected lost earnings during her period of disability." In the absence of circumstances this case does not present, we think that that reflection is found in her earnings over the preceding twelve months.

We are unpersuaded by Becker's reliance on G. L. c. 32, § 7(2)(*a*)(ii), to support her claim that she is entitled to payment under § 111F in an amount equal to her anticipated earnings during the week she was injured. Section 7(2)(*a*)(ii) provides that if a police officer qualifies for accidental disability retirement benefits, those benefits are seventy-two percent of her annual rate of compensation on the date of injury or seventy-two percent of her average annual rate of compensation over the preceding twelve months, whichever is greater. That section, in Becker's view, provides the model for calculating benefits payable under § 111F, and under that model, average weekly earnings over the preceding twelve months are to be used as the basis for compensation only when those earnings are greater than the injured officer's annual rate of compensation on the date of the injury.

First of all, however, the Legislature did not use in § 111F the language it used in § 7(2)(*a*)(ii). See, e.g., *Petrucci* v. *Board of Appeals of Westwood*, 45 Mass. App. Ct. 818, 823 n.8 (1998). Second, the model does not produce the result Becker seeks; to apply the phrase "annual rate of compensation," as appearing in St. 1987, c. 697, § 33, at least in the case of an hourly employee, one must know both the hourly wage and the annual hours it is reasonable to expect the employee will work. Here, the record reflects no dispute about the applicable hourly wage, so the only variable concerns the number of hours she reasonably could anticipate working. As to that, the record is silent, and contains only her historical annual earnings. Even if § 7(2)(*a*)(ii) were accepted as an appropriate model, application of that model to this case yields no different result.

Becker's second claim on appeal is that she is entitled to benefits under G. L. c. 32, § 85H, as amended by St. 1968, c. 213, the pertinent portions of which read as follows:

"Whenever a . . . reserve or special or intermittent police officer of a town . . . is disabled because of injury or incapacity sustained in the performance of his duty without fault of his own, and is thereby unable to perform the usual duties of his regular occupation at the time such injury or incapacity was incurred, he shall receive from the city or town for the period of such injury or incapacity the amount of compensation payable to a permanent member of the police . . . force thereof . . . for the first year of service therein, or if there are no regular or permanent members of the police . . . force thereof, at the rate of three thousand dollars per annum . . . ."

Prior to her injury, Becker operated a private investigation service, an unincorporated entity called Sandy Pointe Investigations. She claims that her injury prevented her from continuing to conduct that business and that, because her work as a private investigator qualifies under § 85H as her "regular occupation," she was entitled to the compensation that statute provides.

To qualify for § 85H benefits, however, the "regular occupation" at issue must "constitute[] at least a substantial source of income" for the injured officer. See *Jones* v. *Wayland*, 380 Mass. 110, 120 & n.15 (1980); *Murphy* v. *Dover*, 35 Mass. App. Ct. 904, 905 (1993). The occupation must be a substantial source of income because the primary purpose of § 85H is to compensate "those public safety officers [such as reserve police officers] most likely to be reliant on other jobs as their primary source of income." *Jones* v. *Wayland*, *supra* at 119.

On this record, as the motion judge concluded, Becker's private investigation business qualified neither as a "regular occupation" nor as a "substantial source of income." Simply put, Sandy Pointe Investigations never produced net income. Instead, gross receipts of $8,314 in 1999, $1,545 in 2000, and $4,487 in 2001 produced net operating losses in each of those years.[7] By definition, a business producing only losses cannot be a "source of income," substantial or otherwise. Becker's apparent claim that the business was in line to produce income in the future is both speculative and irrelevant, for the statute is designed to cushion the blow of a loss of current income, not to provide a hedge

---

[7]$6,467 in 1999; $4,040 in 2000; $343 in 2001.

against speculative future losses. See, e.g., *Politano* v. *Selectmen of Nahant*, 12 Mass. App. Ct. 738, 743 (1981) (purpose of § 85H is to "protect[] the income of the special officer from his regular occupation, if he had one at the time of his injury").

*Judgment affirmed.*