Hines, J.
INTRODUCTION
The plaintiff, John Doe (“Doe”), brought this action against the defendants, City of Lowell (“City”), John F. Cox (“Cox”), and Edward Davis (“Davis”), alleging the wrongful denial of G.L.c. 41, §11 IF disability benefits for an injury sustained in the course of his duty as a police officer. The Complaint alleges that Doe contracted the Human Immunodeficiency Virus (HIV) in 1989 when he pricked his finger with an infected needle while searching a suspect in the course of his duties as a police officer. The City denied Doe’s claim for benefits. Doe’s claims were tried to this court sitting without a jury on April 12, 2004. After considering the testimony of the witnesses and reviewing the exhibits, I make the following findings of fact, rulings of law and order for judgment.
FINDINGS OF FACT
Doe is a homosexual male who has been employed as a police officer for the City of Lowell Police Department (“Department") since August 27, 1987. By all accounts, Doe was an outstanding police officer during his time with the Department. He received three citations, two commendations, numerous letters of praise and a designation as Officer of the Year in 1995. All of this changed on November 4, 1989 after the Department assigned Doe and another officer, Daniel Lamarche (“Lamarche”), to patrol the Adams Street area in Lowell.
While on patrol at approximately 4:00 p.m., Doe and Lamarche observed what they believed to be a drug transaction. When they stopped their patrol vehicle to investigate, the suspects attempted to evade them. Doe managed to apprehend one of the suspects. He then commenced a pat-down for weapons and a search for narcotics. While conducting the search, Doe stuck his bare right index finger on a hypodermic needle that was hidden in a pocket on the sleeve of the suspect’s jacket. Doe noticed that the needle stick had drawn blood. The suspect was arrested for the possession of a hypodermic needle.
After the needle stick, Doe followed the Policy and Procedures Regarding Possible Exposure of Department Personnel to Infectious Disease (“Policy”) adopted by the Department in January 1988. The Policy applies to:
any care provider (e.g. EMT, fire fighter, police officer, or corrections officer) who believes he or she may have had an unprotected exposure to an infectious disease in the course of attending, assisting, or transporting a person to a hospital or clinic as part of his/her professional duties.
Though the Policy requires that all officers carry protective disposable gloves while on duty, it does not explicitly require officers to use gloves during the search of a subject.[2] The precautions outlined in the Policy are mandated only when police officers are “involved in an incident which may result in possible exposure to infectious disease.” The Policy makes no attempt to further define when precautionary measures are required. A police officer who suffers a puncture wound in the line of duty also is obligated to notify his supervisor immediately and complete an incident report detailing the incident. The Policy further requires that the exposed officer be clinically evaluated for evidence of infection through the Ciiy of Lowell Physician’s Office. No provision is made under the Policy for testing of a needle or any other object that has exposed a police officer to the risk of infection. Lastly, the Policy does not impose the burden of testing on the employee.
Immediately after the incident, Doe went to the emergency department of St. Joseph’s Hospital to seek care for his possible exposure to an infectious disease. The treating physicians at St. Joseph’s Hospital administered a tetanus shot and the first of three vaccinations against Hepatitis B, a blood-borne pathogen. The physicians at St. Joseph’s Hospital did not test Doe for HIV, the virus that causes Acquired Immune Deficiency Syndrome (AIDS). Doe was instructed to soak his right index finger and to schedule a follow-up appointment with Dr. John Janas, the City Physician. On November 30, 1989, Doe reported as required for the follow-up appointment with Dr. Janas who also did not recommend HIV testing to Doe. Dr. Janas determined that Doe’s physical examination was “within normal limits” and that “at this time [there is] no sequelae.”
Doe also took immediate steps to notify his supervisor of the incident. He filed a report, as required by the Department’s Policy, outlining the details of the incident.[3] At no time did the Department challenge the accuracy and completeness of the report, investigate the report or demand additional information from Doe.
The Department never tested the needle for the presence of HIV. Nor is testing required under the Policy. The Policy provides only that items contaminated with blood or other body fluids be secured, tagged and preserved. At some point in 2001, however, the City’s counsel placed the needle in a safe at Lowell City Hall.
In August 1991, Doe tested positive for HIV.[4] HIV is a sexually transmitted disease that can be transmitted through contact with the bodily fluids, semen, vaginal secretions, blood, and the breast-milk of an infected individual. HIV can be transmitted via a needle stick, though the risk of transmission is quite low.[5] At the time of his HIV diagnosis, Doe had a CD4 cell count of270. The CD4 cells are a surrogate marker for the functioning of the immune system. Additionally, CD4 counts are used routinely in the field of medicine to estimate stages of the disease progression for chronic conditions like HIV. The normal CD4 count for an individual ranges from 500 to 1500.
*545 By early 2000, Doe’s health had deteriorated to the point that he was unable to perform his duties as a police officer. Doe informed the Department of his HIV status for the first time in February 2000, when he applied for leave with pay pursuant to G.L.c. 41, §11 IF. In April 2000, Doe provided the City with a statement from his physician, Dr. Howard Libman, stating that Doe was unable to perform the tasks required of a police officer due to his deteriorating health. Dr. Libman did not opine on the cause of Doe’s incapacitation. Doe has not reported for duty since January 2000.
Doe’s baseline HIV status at the time of the needle stick is unknown because the physicians who treated Doe never recommended or administered an HIV test to Doe. In addition, the needle and the suspect who carried it, were never tested in order to ascertain whether either was infected with HIV. In 1991 when Doe informed the Department that he had contracted HIV from the needle stick, testing would have been futile. The available scientific evidence suggests that it would not have been possible for the HIV virus to survive the two years that elapsed between the needle stick and Doe’s HIV diagnosis.
Beginning in or about 1987, Doe began a long-term monogamous relationship with another man. After three months, Doe and the man engaged in unprotected sexual activity which continued until their relationship ended in 1990. This man tested negative for HIV on May 20, 2003. Prior to this relationship, Doe engaged in oral sex with other men. Doe, however, used a condom each time he engaged in oral sex with these individuals. Doe has never been an intravenous drug user and has never had a blood transfusion.
The City denied Doe’s claim for leave with pay on May 10, 2000, pursuant to the recommendation of its medical expert, Dr. Jeffrey Griffith,[6] who concluded that Doe’s HIV status was not the result of “an injuiy sustained in the performance of his duty without fault of his own.” Specifically, Dr. Griffith opined that Doe likely contracted HIV seven years prior to his 1991 diagnosis, and therefore approximately five years prior to his 1989 needle stick injuiy. Dr. Griffith’s analysis was informed by several medical publications that, in his view, support the hypothesis that HIV-infected persons generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Using Doe’s CD4 count of 270 at the time of diagnosis, Dr. Griffith assumed that Doe had an average CD4 count of 1000 prior to his infection and that Doe lost sixty CD4 cells per year after he became infected. According to Dr. Griffith’s analysis, Doe’s CD4 count of 270 corresponded with an infection seven years earlier. Dr. Griffith also supported his opinion by reference to Beth Israel Deaconess Hospital medical records suggesting that Doe was diagnosed in the early 1990s with thrush, an AIDS-related condition that usually presents in patients after five to seven years of diagnosis with HIV. However, Doe’s medical records do not indicate either diagnosis or treatment for thrush. Indeed, Dr. Libman, Doe’s physician, certified that Doe was never diagnosed with or treated for thrush at the Beth Israel Deaconess Hospital. No record from any other physician or hospital establishes that Doe ever was diagnosed with thrush.
After his claim was denied in May 2000, Doe submitted supplemental medical information to the City and requested reconsideration of his claim for leave with pay. By letter dated December 7, 2000, the City again denied Doe’s claim, maintaining its position that Doe’s HIV and resulting disability were unrelated to any injuiy arising out of and in the course of his employment as a Lowell police officer.[7]
CONCLUSIONS OF LAW
Doe’s claim for G.L.c. 41, §11 IF benefits rests on his assertion that during the course of his employment as a Lowell police officer; he was stuck by a needle infected with HIV; that he contracted the HIV from the needle stick; and that, as a result, he is incapacitated. The statute provides in relevant part as follows.
Whenever a police officer or fire fighter of a city, town, or fire or water district is incapacitated for duty because of injuiy sustained in the performance of his duty without fault of his own, or a police officer or fire fighter assigned to special duty by his superior officer, whether or not he is paid for such special duty by the city or town, is so incapacitated because of injuries so sustained, he shall be granted leave without loss of pay for the period of such incapacity.
Doe, as the party making the claim under G.L.c. 41, §11 IF, bears the burden of proving that he satisfies all the requirements of the statute. See Adams v. Contributory Retirement Appeal Bd., 414 Mass. 360, 365 (1993) (plaintiff in analogous proceeding under G.L.c. 32, §7(1) bears the burden of proving that he comes within all the terms of the statute).
In order to prevail on this claim, therefore, Doe must establish that: (1) he sustained an injuiy; (2) the injuiy was sustained without fault of his own; (3) the injury was sustained in the performance of his duty; and (4) he is incapacitated for duty because of that injury. Doe established that he suffered the needle stick while searching a suspect in the course of his duty as an officer. See Yates v. City of Salem, 342 Mass. 460, 461-62 (1961) (an officer injured while in uniform, performing the work of a police officer, has suffered an injuiy in the performance of his duty); see also Wormstead v. Town Manager of Saugus, 366 Mass. 653, 659 (1975). The needle stick that Doe sustained to his right index finger qualifies as an injury within the purview of the statute. Blair v. Board of Selectmen of Brookline, 24 Mass.App.Ct. 261, 264 (1987) (an injuiy for purposes of G.L.c 41, §11 IF need not be traumatic in origin). Additionally, the defendant *546 does not challenge that Doe’s needle stick occurred through no fault of his own. See DiGloria v. Chief of Police, 8 Mass.App.Ct. 506, 512-15 (1979) (the test for determining if the injury occurred “without fault of his own” is whether the injury occurred as a result of “serious and wilful misconduct” on the part of the police officer). Indeed, there is no evidence remotely suggestive of misconduct by Doe in causing the needle stick. The only issue, therefore, is whether Doe established that he contracted HIV from the needle stick in 1989, and that his resulting incapacitation due to the progression of HIV stems from that needle stick injury.
Doe argues, and I agree, that the evidence is sufficient to support his claim that the November 4, 1989 needle stick is the likely source of his HIV infection. Though Doe is an acknowledged homosexual, the credible evidence before me establishes that Doe’s sexual conduct, both before and after the needle stick, did not expose him to a substantial risk of contacting HIV. Doe engaged in oral sex with several partners in the years before the needle stick but he used a condom during those encounters. Doe’s relationship with his long-time partner, a man with whom he had unprotected sex, began in 1987 and ended in 1990. This individual, however, tested negative for the HIV in 2003. Doe had no other sex partners after 1990. In these circumstances, I conclude that the needle stick on November 4, 1989 is the likely source of Doe’s HIV.
Second, I credit the opinion of Dr. Jonathan Appelbaum,[8] Doe’s expert, that Doe’s CD4 count of 270 at the time of his HIV diagnosis in 1991 was compatible with having contracted HIV in November of 1989. Dr. Appelbaum based his opinion on extensive professional experience dealing with HIV positive patients and on his review of Doe’s medical records. Nothing in Doe’s medical records confirmed symptoms or conditions that might be associated with HIV having been contracted seven years prior to 1989. Also, in Dr. Appelbaum’s view based on his hands-on experience with hundreds of HIV patients, Doe’s CD4 count was not “unusually low” for a person who had been infected for only two years. Finally, I am persuaded by Dr. Appelbaum’s explanation of the risk of infection from the particular type of needle Doe encountered on November 4, 1989. Though the risk of infection from a needle is relatively low, the risk associated with the hollow-bore needle that caused the injury to Doe is higher than with ordinary needles. A hollow-bore needle is typically used by intravenous drug users, a population at high risk for HIV. Such a needle is more likely to contain blood in the cavity of the needle and, therefore, more likely to transmit HIV if the user is infected with HIV.
The City counters Doe’s claim with Dr. Griffith’s opinion that Doe was infected at least seven years prior to that date. Before reaching any conclusion on the legal significance of the expert opinion offered by the defendant, I review briefly the basic principles governing the admission of the scientific evidence.
Under Commonwealth v. Lanigan, 419 Mass. 15 (1994), a party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community, or by showing that the evidence is reliable and valid through an alternate means. Commonwealth v. Sands, 424 Mass. 184, 185-86 (1997). The trial court’s acceptance of the evidentiary usefulness of a theory or method will not solely depend on general acceptance and validation over time. Lanigan, 419 Mass, at 25 (noting that peer review and publication of the theory or process are pertinent, but not an indispensable predecessor of admissibility). In order for the court to accept an expert’s scientific opinion, the proponent must establish that the expert has “a reliable basis in the knowledge and experience of his discipline.” Id. at 25, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592. A trial judge assessing the credibility of an expert witness must determine whether the scientific testimony that witness proposes engenders the requisite degree of reliability and validity to meet the flexible Daubert standard. To do this, four factors may be considered: (1) whether the theory has been subjected to peer review and publication; (2) whether the theory has been tested; • (3) whether the theory has a known error rate; and (4) whether the theory has general acceptance in the scientific community. Lanigan, 419 Mass, at 25, citing Daubert, 509 U.S. at 593-94. The trial judge, in essence, assumes a “gatekeeper role” in deciding whether the reasoning or methodology of the expert can properly be applied to the facts in issue. Lanigan, 419 Mass, at 26. These considerations guide my analysis of the expert testimony on whether Doe’s HIV infection resulted from the November 4, 1989 needle stick.
Since neither Doe nor the arrestee were tested at the time of the incident, the City offered expert testimony from Dr. Griffith purporting to retroactively determine the approximate date of his HIV infection. Dr. Griffith’s hypothesis is that individuals generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Additionally, individuals not infected with HIV have, on average, a T-cell or CD4 count between 500 and 1500. Dr. Griffith, therefore, assumed that Doe’s average CD4 count prior to HIV infection was 1000, and that upon infection Doe’s CD4 count began declining at a rate of sixty T-cells per year from this base level. Operating from this premise, Dr. Griffith then retroactively calculated that, if Doe had a CD4 count of 270 in 1991, and had lost CD4 cells at a linear rate of sixty per year from a base of 1000, then he would have contracted HIV seven years prior to 1991, and five years prior to the 1989 needle stick injury. Dr. Griffith asserts that the methodology he *547 used to retroactively calculate the date of Doe’s HIV infection is recognized in several medical journals subject to peer review and accepted in the general medical community. Based on this court’s independent review of the literature, however, I conclude that Dr. Griffith’s opinion does not meet the Daubert/Lanigan test.
While publication and peer review establish an indicia of reliability and acceptance within the scientific community under Daubert, this court must examine the reliability and validity of the articles based on their content as well. Daubert, 509 U.S. at 592. None of the articles relied on by Dr. Griffith establish that his methodology, retroactively calculating the date of HIV seroconversion[9] based on CD4 count at diagnosis, is universally accepted or reliable in the medical community.
A study conducted by the Cascade Collaboration, Differences in CD4 Cell Counts at Seroconversion and Decline Among 5739 HIV Infected Individuals with Well Estimated Dates of Seroconversion, J. ACQUIRED IMMUNE DEFICIENCY SYNDROME, 34:76-83 (2003) (“Cascade Study”), focused on assessing the effect of age, sex, exposure group, calendar year at seroconversion, and HIV test interval on the rates of CD4 cell decline during the course of HIV infection to clinical AIDS. The Cascade Study highlights the difficulty with calculating a universal rate of CD4 decline in HIV infected patients, noting that the biologic reason behind the differences in “immunologic response [to HIV] by exposure category observed in this study remains unclear.” Cascade Study at 81. The Cascade Study also noted that the “difference in absolute number of CD4 cells diminishes over time,” and in no way reported a finding that CD4 cells decline in a linear manner, at a rate of sixty cells per year. Id.
The only studies reporting a numerical rate of CD4 cell decline within the sample do not adequately support Dr. Griffith’s methodology of retroactively calculating the date of infection' where the date of seroconversion is unknown. Though one such study reported that a CD4 count declines at a rate of seventy cells per year for HIV positive patients, it did so by specifically focusing on patients in the third through sixth year of disease progression, with known dates of seroconversion, who may have exhibited different AIDS-related conditions. Phillip C. Hopewell, Human Immunodeficiency Virus-Associated Lung Infection: An Overview, SEMINARS IN RESPIRATORY INFECTION 4:73-74 (1989) (“Hopewell Study”). The only conclusion reached by the Hopewell Study was that the concept of AIDS-related conditions “must be broadened to include more than the typical AIDS defining diseases.” Id. at 74.
The Hopewell Study did not use original research, but relied on the original data as reported in Ar Moss et al., Seropositivity for HIV and the Development of AIDS or AIDS related conditions: Three Year Follow Up oftheSanFranciscoGeneralHospitalCohort, BRITISH MEDICAL JOURNAL 296:745-50 (1988) (“Moss Study”). The Moss Study sampled 462 homosexual men in the early 1980s with a focus on determining the likelihood that HIV positive persons will develop AIDS after documented baseline testing. Among the findings, the Moss Study reported that “the baseline adjusted median T4 lymphocyte count” for the sample was set at a rate of approximately eighty-five cells per year. Id. at 749. The Moss Study, however, did not discuss whether the eighty-five CD4 count decline linear model accounted for inter-individual variation, or whether the rate of decline was uniform throughout disease progression, changed based on the stage of disease or presence of AIDS-related conditions, or varied with the concomitant increase of virus burden. The Moss Study also reported that a multivariate analysis of progression to AIDS revealed independent predictive effects associated with significant factors outside of T-cell count such as “(i) microglobulin concentration, (ii) packed cell volume, (iii) HIV p24 antigenaemia.” Id.
A study conducted in 1996, also relied on by Dr. Griffith, directly contradicts the notion that a linear model of CD4 cell decline is scientifically accurate and significant. A.C. Lepri et al., Is there A General Tendency for CD4 Lymphocyte Decline to Speed Up During Human Immuno Efficiency Virus Injection? Evidence From the Italian Seroconversion Study, JOURNAL OF INFECTIOUS DISEASES 174: 775-80 (1997) (“Lepri Study”). The focus of the Lepri Study was whether CD4 cell count decline increases or decreases as lower CD4 cell counts are reached by HIV positive patients. The reported findings of the Lepri Study were that, while CD4 counts suggest an increasing rate of decline of on average 100 T-cells, “there is much inter-individual variability” in the pattern of decline. Id. at 775, 776. The Lepri Study reported that:
we cannot rule out the possibility that some persons maintain high CD4 cell levels for long periods and that others may experience rapid cell decline at very late stages of the disease. The significance of the random quadratic coefficient confirms that individual patterns vary.
Id. at 779. A critical finding of the Lepri Study is that the model for CD4 decline, that was allowed to vary between individuals, is highly significant by the generally accepted standards of the scientific community. Id. at 777. The Lepri Study, therefore, acknowledges the significance of inter-individual CD4 count decline in HIV, and highlights the weaknesses, and diminished scientific significance, of the purely linear model of decline that Dr. Griffith assumes.
Additionally, the very studies relied on by Dr. Griffith also detract from the reliability of his methodology by pointing out the host of factors that significantly *548 affect HIV disease progression, and the rate of CD4 count decline of infected individuals. In P.J. Veugelers et al., Differences in Time from HIV Seroconversion to CD4 Lymphocyte End-points and AIDS in Cohorts of Homosexual Men. AIDS 7:1325-29 (1993) (“Veugelers Study"), scientists concluded that observed differences in CD4 decline are the result of differences in the laboratory site where the disease is measured and the techniques used. Id. at 1328. See also Cascade Study at 80-81 (finding that sex, exposure group, and temporal changes in HIV affect rates of disease progression); Hopewell Study at 73-74 (presence of AIDS-related conditions like Karposi’s Sarcoma or Tuberculosis affects disease progression); Lepri Study at 777 (inter-individual variability model of CD4 decline suggests that different individuals exhibit different patterns of cell decline based on the stage of their disease and their characteristics); Dr. A. Alaues et al., Similar Rate of Disease Progression Among Individuals Infected with HIV 1 Genetic Subtypes A-D, AIDS 13: 901-07 (1999) (suggesting that the virulence of the infecting strain and environmental factors affect the rate of HIV progression).
The studies relied on by Dr. Griffith, therefore, do not support the use of a linear model of CD4 count decline as a scientifically accepted method of retroactively determining a patient’s date of HIV infection. I, therefore, find that Dr. Griffith’s opinion was not developed “in a scientifically sound and methodologically reliable fashion,” and fails to meet the reliability and validity standards articulated in Daubert and Lanigan. See Daubert, 509 U.S. at 590; Lanigan, 419 Mass, at 15.
The defendant suggests that Doe has not met his burden because Dr. Applebaum expressed his causation opinion by stating that Doe’s HIV infection is “compatible with” Doe’s needle stick in 1989. According to the defendant, this terminology is insufficient to prove that Doe meets the “more probable than not” standard of proof required here. Adopting the defendant’s position would impose a standard of scientific certainty on Dr. Applebaum’s testimony beyond that required by Daubert. Id. at 590. Furthermore, Doe has met his burden by excluding all other possible sources of HIV infection via testimony regarding his sexual and medical histoiy. See McAultffe v. Metcalfe, 289 Mass. 67, 69 (1935) (reasoning that there is no rule of law that a causal connection must be shown by expert testimony alone); Shrewsbury Ret. Bd. v. Contributory Ret. Appeal, 5 Mass.App.Ct. 379, 381 (1977) (suggesting that, while “evidence that A is consistent with B, does not by itself warrant a finding that A caused B,” it may assist the finder of fact in reaching that result). Doe has established causation by way of his medical records and his testimony concerning his sexual conduct. The defendant did not rebut this testimony with any specific evidence tending to show that Doe was exposed to HIV by some other source.
I find that Doe is incapacitated because he is unable to perform his duties as an officer due to his deteriorating health stemming from HIV-related complications. Furthermore, on November 12, 2003, Dr. Nabbout, the City physician, found that Doe was medically unable to return to work. Doe, thus, has established that he comes within the purview of G.L.c. 41, §11 IF, and that he is entitled to leave with pay.
ORDER
For the reasons stated above, I enter the following order for judgment. Judgment shall enter in favor of the plaintiff, John Doe, against the defendant, City of Lowell. Doe is entitled to leave without loss of pay pursuant to G.L.c. 41, §11 IF. The complaint is dismissed as to defendants, John F. Cox and Edward Davis.

Even if Doe had worn latex gloves, it is unlikely that this precaution would have prevented the needle stick.

Defendant complains that Doe failed to complete a “standardized form at the health care facility in accordance with G.L.c. Ill and 111C” in violation of the Department’s Policy. It does not appear, however, that Doe can be faulted for failing to complete the form. There is no evidence that this form, which presumably is in the custody or control of the hospital or medical facility, was ever given to Doe. In any event, the failure to complete the form does not bear on the issues before me.

Doe was motivated to get tested because of a relationship involving unprotected sex with another man. He was also responding to the vigorous advocacy of HIV testing.

The undisputed evidence is that the risk of transmission is 0.1%.

Dr. Griffith’s expert qualifications include that he is Board Certified in Internal Medicine, Pediatrics, and Infectious Diseases.

Dr. Elias Nabbout, the current City Physician, concluded on November 12, 2003 that Doe is medically unable to return to work. This opinion, however, sheds no light on the contested issue whether Doe’s disability was caused by the needle stick.

Dr. Appelbaum is board certified in internal medicine. He is the Medical Director of the Fenway Community Health Center which specializes in the treatment of HIV and AIDS patients. Dr. Appelbaum treats approximately 185 HIV/AIDS patients in his practice.

Seroconversion is the process whereby detectable antibodies become present in the blood directed against an infectious agent. Following seroconversion, a person who is infected with HIV would test positive for the disease based on the presence of such antibodies in his blood.